UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION

                Plaintiff,

  - against -

BERNARD L. MADOFF,
BERNARD L . MADOFF INVESTMENT
      SECURITIES LLC,

                Defendants.

-----------------------------------------------------------------------x

08 Civ. 10791 (LLS)

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR EMERGENCY PRELIMINARY RELIEF AGAINST THE DEFENDANTS

JAMES CLARKSON
ACTING REGIONAL DIRECTOR
ANDREW M. CALAMARI
ALEXANDER M. VASILESCU
ISRAEL FRIEDMAN
PREETHI KIRSHNAMURTHY
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center – RM 400
New York, NY 10281
(212) 336-0106

December 11, 2008

# **PRELIMINARY STATEMENT**

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in support of its application for emergency relief, including the appointment of a receiver and an asset freeze, to halt ongoing $50 billion Ponzi-scheme by defendant Bernard L. Madoff ("Madoff") and his broker-dealer and investment adviser firm, defendant Bernard L. Madoff Investment Securities LLC. ("BMIS"), both of which reside or are located in Manhattan. Madoff, who today was criminally charged by the United States Attorney's Office for this District, admitted to Senior Employees of BMIS that he had conducted a "Ponzi-scheme" through the investment adviser services of BMIS. Madoff, who is the sole owner of BMIS, also admitted to Senior Employees of BMIS that the adviser business of BMIS losses amount to $50 billion, far exceeding BMIS's assets. Madoff also told Senior Employees at BMIS in approximately one week he would admit his conduct to the authorities, but during the next week, before he made his admission, he would distribute remaining funds, approximately $100 million, to employees and preferred customers, i.e. friends and family. Such a distribution would be unfair and prejudice other investors and creditors of BMIS and Madoff. Emergency relief is need to halt Madoff's Ponzi-scheme and to prevent any improper or unfair distribution of assets..

Accordingly, the Commission seeks an Order from this Court temporarily (pending a preliminary injunction hearing): (1) appointing a receiver for the assets of BMIS; (2) freezing the assets of Madoff and BMIS (except allowing the receiver to use funds to operate BMIS); (3) enjoining Madoff and BMIS from future violations of the federal securities laws; (4) permitting expedited discovery; (5) preventing the destruction of documents by Madoff and BMIS; (6) requiring verified accountings from Madoff and BMIS; and (7) enjoining BMIS and its affiliates

1

from filing for bankruptcy protection -- and enjoining anyone from seeking an involuntary bankruptcy against BMIS and its affiliates -- without prior notice to the Commission and the Court.

## FACTS

The following facts are supported by the accompanying sworn statement of a law FBIagent Theodore Cacioppi, executed December 11, 2008, and by documents that are public.

Madoff is a resident of New York City and is the sole owner of BMIS. BMIS' website indicates that Madoff founded BMIS in the early 1960s and that he is an attorney. Madoff is a former Chairman of the board of directors of the NASDAQ stock market. BMIS is both a broker-dealer and investment adviser registered with the Commission. Madoff overseas and controls the investment adviser services at BMIS as wells at the overall finances of BMIS. The most recent Form Adv for BMIS filed in January 2008 with the Commission listed BMIS has having over $17 billion in assets under management.

BMIS is a broker-dealer and investment advisor registered in both capacities with the Commission. BMIS engages in three different operations, which include investment adviser services, market making services and proprietary trading. BMIS website states that is has been providing quality executions for broker-dealers, banks and financial institutions since its inception in 1960;" and that BMIS,"[w]ith more than $700 million in firm capital, Madoff currently ranks among the top 1% of US Securities firms"

Since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS. Madoff conducts certain investment advisory business for clients that is separate from the BMIS' proprietary trading and market making activities.

2

Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS. Madoff kept the financial statements for the firm under lock and key, and was "cryptic" about the firm's investment advisory business when discussing the business with other employees of BMIS.

In or about the first week of December, Madoff told Senior Employee No. 2 that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so. According to the Senior Employees, they had previously understood that the investment advisory business had assets under management on the order of between approximately $8-15 billion.

According to a Form ADV filed by Madoff, on behalf of BMIS, with the Commission on or about January 7, 2008, Madoff's investment advisory business served between 11 and 25 clients and had a total of approximately $17.1 billion in assets under management.

On or about December 9, 2008, Madoff informed Senior Employee No. 1 that he wanted to pay bonuses to employees of the firm in December, which was earlier than employee bonuses are usually paid. Bonuses traditionally have been paid at BMIS in February of each year.

On or about December 10, 2008, the Senior Employees visited Madoff at the offices of BMIS to discuss the situation further, particularly because it Madoff had appeared to the Senior Employees to have been under great stress in the prior weeks.

At that time, Madoff informed the Senior Employees that he had recently made profits through business operations, and that now was a good time to distribute it. When the Senior Employees challenged his explanation, Madoff said that he did not want to talk to them at the

office, and arranged a meeting at Madoff's apartment in Manhattan. At that meeting Madoff stated, in substance, that he "wasn't sure he would be able to hold it together" if they continued to discuss the issue at the office.

At Madoff's Manhattan apartment, Madoff informed the Senior Employees, in substance, that his investment advisory business was a fraud. Madoff stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." In substance, Madoff communicated to this Senior Employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors. Madoff stated that the business was insolvent, and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be at least approximately $50 billion. One of the Senior Employees has a personal account at BMIS in which several million had been invested under the management of Madoff.

At Madoff's Manhattan apartment, Madoff further informed the Senior Employees that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends.

## ARGUMENT

I. **MADOFF AND BMIS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Because the Commission is "not ... an ordinary litigant, but ... a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to

secure temporary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). The Commission need not show irreparable injury or a balance of equities in its favor. *Id.*; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990). Rather, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *See* 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d); *see also SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998).[1]

Here, the Commission easily makes a "substantial showing" that (1) Madoff and BMIS have committed current violations of the antifraud provisions of the federal securities laws; and (2) a present risk exists that Madoff and BMIS will repeat their fraudulent conduct in the future if not restrained. Madoff and BMIS have engaged in a Ponzi-scheme which has resulted in losses of $50 billion. Madoff and BMIS's violations of the federal securities laws have been egregious and involved the highest degree of scienter. Given the nature of these violations, a temporary restraining order is warranted to preserve the status quo pending a preliminary injunction hearing.

### A. Madoff and BMIS Violated the Antifraud Provisions of the Federal Securities Laws

Madoff and BMIS violated Sections 206(1) and 206(2) of the Advisers Act and Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (the "antifraud provisions"). Under the antifraud provisions, the Commission must establish that, in

---

[1] The Commission also is relieved of demonstrating the lack of an adequate remedy at law, as private litigants must, to obtain an injunction. *Id.*; *SEC v. Scott*, 565 F. Supp. 1513, 1536 (S.D.N.Y. 1983), *aff'd sub nom.*, *SEC v. Cayman Islands Reins. Corp.*, 734 F.2d 118 (2d Cir. 1984).

the offer or sale of a security, or in connection with the purchase or sale of a security, a party has acted with scienter in making a material misrepresentation or omission. *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992) (citations omitted); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 235 n.13 (1988) (Section 10(b) of the Exchange Act and Rule 10b-5); *United States. v. Naftalin*, 441 U.S. 768, 772, 778 (1979) (Section 17(a) of the Securities Act).

1. <u>Madoff and BMIS Conducted a Fraudulent Scheme, a Ponzi Scheme</u>

Through the investment adviser services of BMIS, Madoff has conducted a ponzi-scheme, whereby he has false represented to investors that returns were being earned on their accounts at BMIS and that he was investing in securities for their accounts. In fact, Madoff, as evidenced by his admissions on December 10, 2008 to his Senior Employees, paid earlier investors with funds raised from later investors. By concealing this activity from investors, Madoff made materially false statements regarding the source of the returns on investers' accounts.

All of the misrepresentations and omissions above are material. Information is considered material if there is a substantial likelihood that a reasonable investor would consider such information important in making an investment decision or if the information would significantly alter the total mix of available information. *Basic*, 485 U.S. at 231-32. Reasonable investors obviously would consider material the bogus nature of the transactions at issue, not to mention the elaborate fraudulent devices that Madoff employed to create the appearance that they were real. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) (misleading statements and omissions concerning the use of money raised from investors were material as matter of law); *see also United States v. Siegel*, 717 F.2d 9, 14-15 (2d Cir. 1983)

(holding that failure to disclose the misappropriation of more than $100,000 was a fact which would be important to a stockholder in his decision making).

2. Madoff and BMIS Acted With Scienter

Madoff acted with scienter, which is a mental state embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder, et al.*, 425 U.S. 185, 193 (1976).[2] The Second Circuit has held that reckless conduct generally satisfies the scienter requirement. *See, e.g., SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (holding that scienter required for a Section 10(b) or Rule 10b-5 claim "may be established through a showing of a reckless disregard for the truth"), *citing Rolf v. Blyth, Eastman, Dillon & Co.*, 570 F.2d 38, 46 (2d Cir. 1978); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir. 1982).

As noted above, Madoff already has confessed to central aspects of his fraudulent scheme, and the additional evidence establishes that he was well aware of all other aspects of it.

3. The "In Connection With" Requirement

The Commission also satisfies the "in connection with" and "offer or sale" requirement of a securities fraud violation. Madoff told investors that he would invest in various securities, such as commons stock, which are "securities" as defined by the federal securities laws, 15 U.S.C. § 78c(a)(10), and Madoff's fraudulent transactions plainly were "in connection with" the

---

[2] A violation of Section 17(a)(1) of the Securities Act also requires a showing of scienter. However, the Supreme Court has held that scienter need not be shown in order to establish violations of Sections 17(a)(2) and (3) of the Securities Act. *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980).

7

sale of those notes, and in their "offer and sale."[3] Also, Madoff committed investment advisory fraud as his Ponzi-scheme was committed through the accounts of advisory clients.

### B.  Madoff and BMIS Are Likely To Continue His Illegal Conduct

In determining whether to grant emergency relief, courts consider the likelihood that, unless enjoined, a defendant will violate the securities laws again. *SEC v. Cavanagh*, 155 F.3d at 135. As the Second Circuit instructed in *Management Dynamics, Inc.*:

> Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations. . . . [F]actors suggesting that the infraction might not have been an isolated occurrence are always relevant. . . . Moreover, appellate courts have repeatedly cautioned that cessation of illegal activity does not ipso facto justify the denial of an injunction.

515 F.2d at 807. In assessing likelihood of repetition, courts also look to such factors as the character of the violation, the degree of scienter involved, and the degree to which a defendant's occupation or activities may present future opportunities to violate the law. *E.g., Cavanagh*, 155 F.3d at 135; *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 100-01 (2d Cir. 1978); *SEC v. Musella*, 578 F. Supp. 425, 444 (S.D.N.Y. 1984).

As demonstrated above, Madoff's and BMIS's violations of the federal securities laws have been egregious and exhibited a high degree of scienter. Most significantly, Madoff as of yesterday was seeking to continue to conceal his fraudulent scheme and make unfair

---

[3] That the securities were fictitious is irrelevant. Fictitious securities are subject to the antifraud provisions of the federal securities laws despite the fact that the securities do not exist. *SEC v. Gallard*, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("the antifraud provisions relied upon by the Commission are applicable even where, as here, the "security" at issue does not exist." (internal citations omitted); *see also S.E.C. v. Lauer*, 52 F.3d 667, 671 (7th Cir. 1995) ("An elementary form of [ ] misrepresentation is misrepresenting an interest as a security when it is nothing of the kind.") (internal citations omitted); and *SEC v. Roor*, 2004 WL 1933578, at *5 (S.D.N.Y. Aug. 30, 2004)

8

distributions to employees, family and friends at the expense of other clients and creditors. Given the nature of Madoff's violations, and his persistence in continuing his fraud, a temporary restraining order is warranted to prevent him from any additional violations.

## II. THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION, AND ORDERLY RESOLUTION OF DISPUTES CONCERNING, MADOFF AND BMIS ASSETS

The Court should order the appointment of a receiver, asset freeze, and an accounting to preserve and identify stolen funds, and to facilitate the orderly resolution of anticipated disputes concerning the ultimate distribution of the assets of BMIS and its affiliates. The Court also should order expedited discovery and prohibit the destruction of documents to allow for the efficient and just prosecution of this action.

### A. The Court Should Appoint a Receiver

The Court should appoint a receiver for the assets of BMIS and its affiliated entities. Courts will appoint a receiver where necessary (1) to preserve the status quo while various transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct, *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d at 1105; (2) to protect "those who have already been injured by a violator's actions from further despoliation of their property or rights," *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 131, 143 (2d Cir. 1964); (3) to prevent the dissipation of the defendant's assets pending further action by the court, *SEC v. American Board of Trade, Inc.*, 830 F.2d at 436; (4) to install a responsible officer of the court who could bring the companies into compliance with the law, *id.* at 437; or (5) to place hopelessly insolvent entities in bankruptcy to effect their liquidation, *id.* at 436.

A temporary receiver for the assets of BMIS and its affiliates is necessary to secure any

9

such remaining assets, prepare an accounting of those assets, maximize the amount of available assets, and facilitate orderly resolution of anticipated competing claims to those assets. The Commission is ready and willing to assist the Court in identifying and appointing an appropriate receiver if the Court wishes the Commission's assistance.

### B. Asset Freeze of Madoff and BMIS

In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon and civil penalties. The ancillary remedy of a freeze of the assets of Madoff and BMIS is appropriate and necessary here in order to ensure that sufficient funds are available to satisfy any final judgment the Court might enter against the Defendants and to ensure a fair distribution to investors. *See, e.g., Unifund, SAL,* 910 F.2d at 1041-42 (asset freeze was warranted in amount sufficient to satisfy potential judgment for penalties in insider trading case); *Int'l Controls Corp. v. Vesco,* 490 F. 2d 1334, 1347 (2d. Cir. 1974) (noting that "an asset freeze may be appropriate to assure compensation to those who are victims of a securities fraud"); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1106 (2d Cir. 1972) (fraudulent nature of appellants' violations and uncertainty regarding amount and location of proceeds warranted asset freeze to preserve the status quo); *SEC v. Grossman,* 1987 U.S. Dist. LEXIS 1666 at *35 (S.D.N.Y. Feb. 17, 1987); *SEC v. Vaskevitch,* 657 F. Supp. 312, 315 (S.D.N.Y. 1987); *see also SEC v. General Refractories Co.,* 400 F. Supp. 1248, 1259 (D.D.C. 1975) (it is within the Court's authority to grant effective equitable relief by temporarily freezing assets "in order to assure a source to satisfy that part of the final judgment which might [ultimately] be ordered").

An asset freeze ensures that a defendant's assets, whether in the control of the defendant or its agents, are not secreted or dissipated prior to the time that disgorgement is ordered.

*Cavanagh*, 155 F.3d at 136 (affirming district court's asset freeze order where the freeze merely "freeze[d] the status quo"); *Vaskevitch*, 657 F. Supp. at 315 ("[a]s to the issue of an asset freeze, the court certainly has the ability to ensure that the defendants' assets are not secreted or dissipated before entry of final judgment concluding this action"); *see also Manor Nursing Ctrs.*, 458 F.2d at 1106 (fraudulent nature of appellants' violations and uncertainty regarding amount and location of proceeds warranted asset freeze to preserve the status quo). Accordingly, courts have imposed orders freezing assets of defendants, so that, if the Commission is ultimately successful in an enforcement action, meaningful relief for defrauded investors can be obtained. *See Unifund SAL*, 910 F.2d at 1041; *SEC v. American Bd. of Trade, Inc.*, 830 F.2d 431, 438 (2d Cir. 1987).

The ancillary remedy of a freeze order requires a lesser showing than that needed to obtain an injunction against future securities law violations. *See SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) (stating that "courts may order a freeze even where the SEC has failed to meet the standard necessary to enjoin future violations of the securities laws"). When there are concerns that defendants might dissipate assets, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. *Unifund SAL*, 910 F.2d at 1041 (upholding asset freeze order even though the evidence was insufficient to support entry of a preliminary injunction); *see also SEC v. Heden*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999); *SEC v. Margolin*, 1992 U.S. Dist. LEXIS 14872, at *19-22 (S.D.N.Y. Sept. 30, 1992); *Grossman*, 1987 U.S. Dist. LEXIS 1666 at *35-36.

As described above, the Commission staff has developed significant evidence that Madoff and BMIS have committed a Ponzi-scheme of $50 billion. Madoff is now seeking to distribute remaining assets to employees, family and friends, which would be unfair to the

remaining clients and creditors. Thus, an immediate asset freeze is necessary to prevent further dissipation of funds from any such accounts, to permit an accounting of BMIS' assets, and to sort through the tangle of anticipated competing claims to any funds remaining in the accounts of BMIS.

For the reasons set forth above, the Commission is likely to succeed on the merits of its case for antifraud violations. An asset freeze therefore should issue to preserve the Defendants' ability to satisfy future court-imposed remedies and to protect victims of his fraud against further dissipation of their assets. *See* Exchange Act Section 21(d)(5), 15 U.S.C. § 78u(d)(5), (codifying Section 305 of the Sarbanes-Oxley Act, which provides that "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors").

### C. **Accountings**

The reasons supporting the requested asset freeze apply with equal force to the Commission's request for a verified accounting by Madoff and BMIS of his assets. The equitable remedy of a sworn accounting is frequently imposed to provide an accurate measure of unjust enrichment and a defendants' current financial resources. *See, e.g., Manor Nursing Ctrs.*, 458 F.2d at 1105; *SEC v. Oxford Capital Securities, Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992); *SEC v. Bloom*, 1988 U.S. Dist LEXIS 2487 (S.D.N.Y. Jan. 12, 1988).

The Commission requests that the Court order, as part of its emergency relief, that BMIS prepare an accounting of his assets. Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of all funds obtained as a result of fraudulent activity,

as well as a measure of unjust enrichment and defendants' current financial resources. *See, e.g., Manor Nursing Centers*, 458 F.2d at 1105; *SEC v. Oxford Capital Securities, Inc.*, 794 F. Supp. 104, 105-106 (S.D.N.Y. 1992). A prompt and complete accounting will assist in determining whether any assets remain and where they are located. Thus, an accounting remedy is needed here to determine the disposition of funds that Madoff and BMIS misappropriated through Madoff's fraudulent scheme and the assets available for disgorgement.

### D. The Court Should Enter An Order Permitting Expedited Discovery And Prohibiting The Destruction Of Documents

The Court should grant the Commission's requested for expedited discovery to permit the Commission to act quickly to obtain bank and other records necessary to identify and preserve investor assets and determine whether the scope of Madoff's fraud. Likewise, the Court should enter an order prohibiting the Defendants from destroying or altering documents, to preserve as much of the evidence as possible given the nature, and continuing nature, of Madoff's misconduct.

### E. Bankruptcy Injunction

Finally, the Court should enjoin BMIS from filing for bankruptcy protection -- and enjoin anyone from seeking an involuntary bankruptcy against BMIS -- without filing a motion on at least three (3) days' notice to the Commission, and approval of this Court after a hearing. Such relief will likewise permit the Court (and any court-appointed receiver) to ensure an orderly disposition of the assets of BMIS, and of the anticipated competing claims to those assets.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying declarations and exhibits thereto, the Commission respectfully requests that the Court grant its application for emergency relief.

Dated: December 11, 2008
New York, New York

JAMES CLARKSON
ACTING REGIONAL DIRECTOR

_____
Alexander M. Vasilescu (AV-2575)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center – RM 400
New York, NY 10281
(212) 336-1023

**Of Counsel:**

Andrew M. Calamari (AC-4864)
Alexander M. Vasilescu (AV-2575)
Israel Friedman (IF-1958)
Preethi Krishnamurthy (PK-2809)